# IN THE COURT OF CRIMINAL APPEALS OF TENNESSEE
## AT NASHVILLE
Assigned on Briefs at Knoxville December 13, 2011

## STATE OF TENNESSEE v. MITCHELL JAROD FORD

**Appeal from the Circuit Court for Marshall County**
No. 10-CR-79    Robert Crigler, Judge

---

**No. M2011-01504-CCA-R3-CD - filed August 24, 2012**

---

The Defendant, Mitchell Jarod Ford, was convicted by a Marshall County Circuit Court jury of arson and aggravated burglary, Class C felonies.  See T.C.A. §§ 39-14-301, 39-14-403 (2010).  He was sentenced as a Range III, persistent offender to two concurrent fifteen-year terms.  The trial court ordered the sentences to be served consecutively to three previous sentences.  On appeal, the Defendant contends that (1) the evidence is insufficient to support his convictions and (2) the trial court erred by imposing fifteen years' confinement for each conviction.  We affirm the judgments of the trial court.

**Tenn. R. App. P. 3 Appeal as of Right; Judgments of the Circuit Court Affirmed**

JOSEPH M. TIPTON, P.J., delivered the opinion of the court, in which JAMES CURWOOD WITT, JR., and JOHN EVERETT WILLIAMS, JJ., joined.

Donna Orr Hargrove, District Public Defender; and William Harold (on appeal and at trial) and Michael J. Collins (at trial), Assistant District Public Defenders, Shelbyville, Tennessee, for the appellant, Mitchell Jarod Ford.

Robert E. Cooper, Jr., Attorney General and Reporter; David H. Findley, Senior Counsel; Charles Frank Crawford, Jr., District Attorney General; and Weakley E. Barnard and Chris Collins, Assistant District Attorneys General, for the appellee, State of Tennessee.

## OPINION

This case relates to the arson of a vacant home in Marshall County, Tennessee.  At the trial, Lewisburg Police Officer Jennifer McDonald testified that on April 23, 2010, she responded to a possible vandalism or burglary of a home at 603 Old Lane in Marshall County.  She went inside the home and found a large hole in the bedroom ceiling.  Although

the residence was unoccupied, homeowner Judy Crawford told her that the hole was new. Officer McDonald said she could not determine the cause of the hole or whether the hole was cut or pushed out. She said she walked around the home and saw that the back door and windows were locked and that the garage door was open. She saw a lot of trash, old fixtures, and old furniture in the garage and an access hole in the ceiling that led to the attic. She said a ladder was near the access hole. She did not go into the attic over the garage.

Officer McDonald testified that Ms. Crawford told her that no one was allowed in the home and that it was strange that nothing was missing. Ms. Crawford requested additional police patrols in the neighborhood. She said that she arrived at the home around 11:00 a.m. and that she finished her investigation by 11:30.

On cross-examination, Officer McDonald testified that she did not see guns, a big-screen television, or jewelry in the home. She agreed that those items were sometimes taken during a burglary. She said the doors to the home were locked but agreed the garage may have been a "point of entry." She said she did not attempt to speak to the neighbors.

Judy Crawford testified that her husband, Larry Duckworth, died on December 11, 2009, and that the home at 603 Old Lane was part of his estate. She said that her late husband lived there before they married and that they lived in her Bedford County home after they married. She said that she was the executrix of her husband's estate and that her duties required her to care for the home. She said that either her stepson was going to buy the home or she was going to sell it. She said that her stepson did not like her serving as executrix of the estate and agreed that there were "unpleasantries" between them.

Ms. Crawford testified that she asked James Gaylor to watch the home during the week and help keep the yard maintained but that Mr. Gaylor did not have a key to the home. She said she went to the home on April 23, 2010, around 10:00 or 10:30 a.m. and noticed the blinds in the front window were not hanging correctly. She called Mr. Gaylor, who entered the home with her. She said that the front door was locked and that she saw a four-by-eight-foot hole in the bedroom ceiling and the drywall from the ceiling on the floor. She could not determine if the ceiling was cut or pulled down. She stated that she called the police after being at the home for about five to ten minutes but that she could be wrong about the time she arrived.

Ms. Crawford testified that before she left the home, she made sure all the doors were locked. She said she returned to the home because she thought she left her cell phone inside. She agreed that after looking for her phone, it was about 12:30 p.m. She did not smell smoke or see fire while she was at the home and said she did not tamper with or touch the back door

before leaving at 12:30 p.m. She locked the front door when she left and said the house was secure.

Ms. Crawford testified that before April 23, 2010, she did not know the Defendant and did not give him permission to go into the home. She agreed she had an interest in the home as the estate's executrix. She said she did not give the Defendant or anyone else permission to start a fire in the home. She said all the home's utilities had been disconnected for about five months. She said that a rake and shovel, clutter, and gas cans were on the garage floor but did not recall newspapers being there. She said furniture, dishes, and other items were inside the house.

Ms. Crawford testified that at about 1:00 p.m., she received a telephone call from her late husband's niece, who told her the home was on fire. She said she returned to the home with her son, who was a firefighter. She said that by the time she arrived, the fire was extinguished but that she saw smoke. She said that most of the fire damage was over the garage and the kitchen. She said the firemen knocked down the back door to get into the home. The fire department told her that she was responsible for boarding up the home, and she paid for the expenses personally. She said the cost of the repairs exceeded the value of the property.

On cross-examination, Ms. Crawford testified that her late husband owned the property with his sister and that they lived at the home for a period of time. She said that on the day of the fire, she locked the door but not the deadbolt, which was never used. She said she had not seen the Defendant around the home. She did not recall seeing cars parked along the street or seeing a gold Saturn.

James Gaylor testified that he lived across the street from Ms. Crawford's home on April 23, 2010, that he mowed the yard periodically, and that Ms. Crawford asked him to watch the house. He said that he saw cars in the driveway once or twice and that the cars belonged to Ms. Crawford or her son.

Mr. Gaylor testified that on the day of the fire, the weather was nice and that Ms. Crawford's house was not on fire when he left between 11:00 a.m. and 12:00 p.m. to go to a gas station. He said that he was gone for about ten minutes and that on his way home, he saw a gold Saturn parked in front of the house's garage. He said he had never seen the gold car before that day. He said the car was backed into the driveway and thought it was odd because the police were at the house earlier that morning. He said that he saw a black male walk out the front door and that he yelled, "What are you doing over there?" He said the man got into the gold Saturn and left. He said he yelled for the man to stop because he wanted to know why the man was inside the house. He said that as he tried to get the car's license

-3-

plate number, he heard his children screaming and noticed smoke coming from the house. He said the car sped off when his children started screaming. He said he saw an "H" and an "4" on the license plate and noticed it was a special plate with blue writing.

Mr. Gaylor testified that he saw the same gold Saturn with the special license plate one to two hours later on Highway 64, that he followed behind the car flashing his lights and honking the horn, and that he tried to get the car to pull over. He said that the gold Saturn turned onto Simms Road and that he called 9-1-1. He was sure it was the same gold Saturn from Ms. Crawford's driveway because of the license plate. He continued to follow the car while speaking to a 9-1-1 dispatcher and said the driver threw something that looked like white paper from the diver's side window. He said that he stopped when the Saturn approached a police roadblock.

Mr. Gaylor testified that the black male he saw leaving Ms. Crawford's home wore a white t-shirt with the sleeves cut off and stone washed jeans. When asked if he saw the man's face, he said, "Kind of, sort of. I was kind of mad. And I was screaming and hollering. But I mean, I looked at the person when I did it." He identified the Defendant as the man he saw leaving Ms. Crawford's house in a gold Saturn and as the man he followed on Highway 64. He said that the Defendant was wearing a long-sleeve shirt when the police arrested him at the roadblock but that the t-shirt he saw earlier was underneath the long-sleeve shirt.

Mr. Gaylor testified that he did not see any other cars in Ms. Crawford's driveway on April 23, 2010, other than the police and Ms. Crawford's car that morning around 8:30 or 9:00. He said that other than the ten minutes he was gone to the gas station, he was outside his home from the time the police left at 8:30 or 9:00 until the time he saw the Defendant's car in the driveway. He said he would have seen anyone else in the driveway or go into the house. He said the Defendant was the only person he saw in the gold car that day.

On cross-examination, Mr. Gaylor testified that he was convicted of theft and felony evading arrest in 2002 and that he had lived across the street from Ms. Crawford's house for about eight months. He said he did not know her stepson. He said that although his "adrenaline was running," he thought the gold Saturn had four doors. He said he saw the Defendant for the length of time it took the Defendant to close the front door and walk from the front door to his car. He said only his family saw the gold Saturn.

Mr. Gaylor testified that he called 9-1-1 when he heard his children screaming that the house was on fire and that he took his son to a doctor's appointment after the fire department left. He said that about one to one and one-half hours passed from the time he called 9-1-1

until his departure for the doctor. He said he gave a statement to the police while inside his home.

Mr. Gaylor testified that when he followed behind the Defendant on Highway 64, the Defendant tried to get away from him. He agreed that if someone pulled up behind him flashing the headlights, following closely, and blowing the horn, he would get nervous and try to run. He said the Defendant stopped the gold Saturn, got out of the car, and asked what he was doing. He said that when he accused the Defendant of starting the house fire, the Defendant returned to his car and drove away. He said that he followed the Defendant for about fifteen to twenty minutes and that he saw the license plate during that time. He stated that he only saw the man leaving the house and that he did not see anyone start the fire.

On redirect examination, Mr. Gaylor testified that when he gave his statement to the police, he told the officer everything he saw, including the license plate number. On recross-examination, he testified that he saw an "H" and a "4" on the license plate. He said that if a recording showed that he only reported seeing an "H" on the license plate, it was accurate.

City of Lewisburg Fire Inspector Bob Davis testified that on April 23, 2010, he arrived at the scene around 1:00 p.m., that he was the first responder, and that the firemen arrived about forty-five seconds later. He said he determined that no electricity was running to the home because the electrical meter was not attached to the home. He saw fireman go in the back after they broke down the back door with a concrete block. He said that breaking a door down was not usual if the door was unlocked. He stated that after the fire was extinguished, he took photographs of the living room, kitchen, and the ceiling destroyed by the fire.

Lewisburg Firefighter Ray Luna testified that when he arrived at the scene, he saw thick, gray smoke. He said the fire did not break through the roof because the smoke was not dark. He said shingles and tar burned after a fire broke through a roof and caused dark smoke. He said he opened the gable where the garage was located. He said that the back door in the garage was locked, that he used a concrete block to open the door, and that the door was also chain-locked. He said the garage contained boxes and various belongings, which blocked the back door.

Mr. Luna testified that once he entered the garage, he knocked down the ceiling with a "pike pole." He said the smoke came from the loft area above the garage ceiling. He said he saw wooden steps leading to the loft, which was big enough for an adult to stand upright depending on height. He saw papers, books, clothes, a bed frame, and a mattress in the loft. He said that from the loft, he saw a hole in the bedroom ceiling. He said no electricity or gas

ran to the home because the meters had been removed. He said the fire caused structural damage to the home and centered around the loft.

Lewisburg Firefighter Jason Davis testified that when he arrived at the scene with Captain Lynch and Fireman Hundley Ford, the Defendant's father, he saw dark, black smoke and some white smoke. He said black smoke meant that a "hydrocarbon, oil based" accelerant or gas could be involved or that something plastic was burning. He said he did not see flames when he arrived, which meant that the fire had not burned long. He agreed flames coming from the roof and eaves of the home meant that the fire had burned long enough to destroy the wood inside the home.

Mr. Davis testified that another fireman told him to go into the bedroom where a large hole in the ceiling was found. He said he went into the bedroom, used a ladder to climb into the attic, and crawled across the ceiling toward the loft. He did not know what caused the hole in the bedroom ceiling. He said that it looked as though someone tore the ceiling down. He said he did not fall though the ceiling when he crawled across. He agreed that someone could have climbed the ladder to the loft, walked across the ceiling, gone through the opening in the bedroom ceiling, and left through the front door.

On cross-examination, Mr. Davis testified that he met Hundley Ford at work and that he had known Mr. Ford for many years. He said Mr. Ford drove a gold Saturn. He believed the Saturn had four doors but said he was not sure. He said he saw the Defendant around the firehouse periodically. He said that when the firemen left the fire station, he did not see Mr. Ford's gold Saturn.

Lewisburg Fire Chief Larry Williams testified that the first fireman arrived on the scene around 1:01 p.m., two to three minutes after they received information about the fire, and that he could not see the home because of the thick smoke. He said that he saw very little black smoke at that time and that most of the smoke was dark gray. He said the dark gray smoke told him that the fire was burning "ordinary combustibles," such as wood or cloth. He said black smoke meant that some kind of petroleum product, such as plastic or vinyl, was burning. He said that when he got closer to the home, he saw that most of the smoke came from above the garage. He said his men began extinguishing the flames.

Chief Williams testified that the home was searched and that nobody was found inside the home. He said that although most of the smoke centered around the loft area of the attic, the entire attic filled with smoke and caused smoke to escape from the gable and eaves of the home. He said that had the fire department arrived any later, there would have been "a major working fire." He said that the fire had burned for less than five minutes when he arrived and that the fire caused structural damage to the home. He said that he called the fire marshal

because it was suspicious that witnesses saw someone leave the home while smoke was visible and that the utilities were not connected. He said Special Agent Russell Robinson came to the scene and determined the cause of the fire.

Special Agent Russell Robinson with the State of Tennessee Fire Marshal's Office, an expert in arson investigation, testified that he was told a witness saw someone leave the scene just before smoke became visible. He said that when he arrived at the scene around 1:00 or 1:30 p.m., the fire was extinguished. He said that he ruled out weather as the cause of the fire because there was no lightening on April 23, 2010.

Agent Robinson testified that most of the damage caused by the fire was in the loft above the garage. He drew two diagrams of the scene, which were received as exhibits. He said that the origin of the fire was in the loft along a wall separating the loft from the attic and that the wall was above the kitchen. He said he climbed the stairs into the loft and took three photographs. The photographs showed extensive fire damage, charring to the wood of the home, a bed frame and box springs, and the remains of two "box style fans." A photograph showed a "V pattern" in the charring of the wood on the wall separating the loft from the remainder of the attic. Agent Robinson said the pattern showed the fire's origin and was "a classic example" of a burn pattern in arson cases. He said that a fire burned up and out, creating a V-shaped pattern. Another photograph showed the entrance of the loft and the damage caused by the fire. He said there was no evidence that the entrance to the loft was "boarded up" before the fire. He said that the fire took minutes to ignite the loft and the items in the loft, that the mattress in the loft helped fuel the fire, and that no accelerants were used.

Agent Robinson testified that he took a photograph of the electrical meter box on the exterior of the home, which showed that a meter was not installed at the time of the fire. He concluded that the fire was not the result of an electrical problem. He determined gas was not running in the home and excluded it as the cause of the fire.

Agent Robinson testified that a witness seeing someone leave the home within thirty minutes of seeing the smoke eliminated spontaneous combustion as the cause of the fire. He stated that spontaneous combustion was a slow and smoldering fire and would have taken hours or days to ignite everything in the loft. He stated that he excluded the kitchen as the cause of the fire and that he concluded that someone intentionally started the fire. He said the fire began from an open flame, such as a lighter or a match.

Agent Robinson testified that he examined the bedroom with the hole in the ceiling and saw the "gypsum board" that fell from the ceiling. He said the bedroom ceiling was "mechanically damaged," which meant that someone cut or "punched through" the ceiling.

-7-

He said that he entered the attic through the hole in the bedroom ceiling and that it was possible for someone to walk from the hole in the bedroom ceiling to the loft area in the attic. He said that aside from the hole in the bedroom ceiling, the only other means of an exit from the attic were the stairs from the loft in the garage. On cross-examination, Agent Robinson testified that he did not find matches, a lighter, or a flint at the scene and that there was no way to know which open flame source caused the fire. He said he did not know when the hole in the ceiling was made.

Tennessee Highway Patrol Trooper James Crump testified that during a driver license checkpoint on Highway 64 on April 23, 2010, he saw a gray minivan following a gold, two-door Saturn and that both cars left the road. He identified the Defendant as the driver of the Saturn and Mr. Gaylor as the driver of the minivan. He stated that Mr. Gaylor told him the Defendant started a house fire. He said he heard about Mr. Gaylor's following the Defendant on his police radio before they arrived at the checkpoint. He stated that he contacted the Lewisburg Police Department, that a detective came to the checkpoint, and that they arrested the Defendant. He stated that Mr. Gaylor identified the license plate on the Defendant's car as the license plate on the car he saw leaving Ms. Crawford's house. He said the Defendant wore a dark long-sleeve shirt, a white tank top underneath the shirt, and khaki pants. He stated that Mr. Gaylor told him the Defendant was wearing the tank top underneath the long-sleeve shirt. He said that although he did not make a police report of the incident, he wrote down the Saturn's license plate number, H2941.

On cross-examination, Trooper Crump testified that the Defendant told him that Mr. Gaylor was following him. He did not recall the Defendant's stating Mr. Gaylor tried "to run him off the road." He said that he did not smell smoke or gasoline on the Defendant or see anything in the Defendant's car that could be used to start a fire. He stated that Mr. Gaylor was about fifty feet from the Defendant when Mr. Gaylor told him the Defendant started a house fire.

Lewisburg Police Officer Kevin Clark testified that he arrived at the scene around 1:00 p.m., about two minutes before the fire department, and that he saw people across the street and smoke coming from the home. He spoke to Mr. Gaylor, Andy Watts, and Clellene Banks, and Mr. Gaylor told him about the gold Saturn and gave him a partial license plate with an "H," a "9," and a "4." He said he stayed at the scene until the fire was extinguished.

Officer Clark testified that he left the scene and drove to Highway 64 to take the Defendant into custody. He said the license plate on the Defendant's car was H2941 and was a military honorable discharge plate with red, white, and blue coloring. He said that he took the Defendant to the parking lot at Wright's Paving and that Ms. Watts and Ms. Banks identified the Defendant as the person who left the scene in the gold Saturn. He said they

both identified the Defendant without hesitation from about 100 feet away. On cross-examination, Officer Clark testified that he did not see a gold Saturn at the scene. He said the Defendant was the only person in his car when Ms. Watts and Ms. Banks identified the Defendant. He said it was possible that Ms. Watts and Ms. Banks had cell phones during the identification.

Clellene Banks testified that she lived at 606 Old Lane Road on April 23, 2010, and that she worked at the Shell Quick Market, which was "a stone's throw distance" from her home. She said her husband, Mr. Gaylor, mowed Ms. Crawford's lawn and watched the house. She said that before the fire, the police came to the house and that Mr. Gaylor talked to them. She said that after Mr. Gaylor returned home, they and their son drove to a gas station to get gas for their lawnmower. She did not see anyone at Ms. Crawford's house when they left. She said that they were gone about ten minutes and that she saw a gold Saturn backed up to the garage when they returned.

Ms. Banks testified that she had never seen the Saturn before April 23. She identified the Defendant as the man standing at the trunk of the Saturn. She said the Defendant wore dark pants and a white t-shirt but did not recall anything about the shirt's sleeves. She said that Mr. Gaylor asked the Defendant if he could help the Defendant and what the Defendant was doing at the house. She said the Defendant did not respond, got into the car, and drove away. She said he was not in a hurry until smoke started coming from the garage.

Ms. Banks testified that she and Ms. Watts, her daughter, told the police they could identify the Defendant. She said she made eye contact with the Defendant as he started to drive away. She said that she saw smoke and that the Defendant sped away. She said that Mr. Gaylor called the fire department and that she told the police what she saw. She said she met Officer Clark at a business on Old Lane Road, that Officer Clark got the Defendant out of the police car, and that she told the police that the Defendant was the man who "set the house on fire." She recalled that she was about 100 feet from the Defendant and stated that he had put a dark shirt over his t-shirt.

On cross-examination, Ms. Banks testified that the Saturn had four doors but that she was "not positive." She did not talk to the Defendant. She did not recall if the Defendant's t-shirt had sleeves but said it was not a tank top. She said that as the Defendant drove away, she saw a dark shirt in the car and that the shirt was similar to the shirt the Defendant wore when she identified him. She said the Defendant was the only person the police showed her. She said that she had a cell phone and that Mr. Gaylor called her from his cell phone as he followed behind the gold Saturn. She said that she was familiar with the cars in her neighborhood, that she did not recall a gold Saturn parked on her street, and that a gold Maxima was parked down the street from her home.

Lewisburg Police Detective James Johnson testified that the fire department and other police officers were at the scene when he arrived around 1:03 or 1:04 p.m., that the fire was suspicious, and that he called Agent Robinson to help investigate. He learned that the Defendant lived on Nashville Highway and said that the Defendant's home was between the scene and the place where Mr. Gaylor saw the Defendant on Highway 64. He said it took about fifteen minutes depending on traffic to drive from Old Lane Road to where the Defendant was spotted on Highway 64. He agreed that Nashville Highway connected to Old Lane Road and that Highway 64 connected to Nashville Highway at a different location.

Detective Johnson testified that he was present for Ms. Banks's identifying the Defendant and that she was about 100 feet from the Defendant. He said that Ms. Banks and Ms. Watts identified the Defendant without hesitation. He said he left the scene around 2:46 p.m. to talk to the Defendant at the police station.

On cross-examination, Detective Johnson testified that it was coincidental that the Defendant's home was close to the scene. He denied telling Ms. Banks and Ms. Watts that Officer Clark was bringing the man from the roadblock for them to identify. He said he told Ms. Banks and Ms. Watts that the police had a man for them to identify. He said the Defendant was wearing a blue shirt, a white t-shirt underneath the blue shirt, and khaki pants at the time of Ms. Banks's identification. He thought the blue shirt had three buttons and did not recall if the shirt had long sleeves. On redirect examination, Detective Johnson testified that if Ms. Banks and Ms. Watts had hesitated or been unsure of the identity of the man they saw leaving the scene, the Defendant would not have been arrested. On recross-examination, he stated that Ms. Banks and Ms. Watts only identified the Defendant while in the parking lot and that they were not shown a photograph lineup.

Upon this evidence the Defendant was convicted of arson and aggravated burglary. The trial court sentenced the Defendant to two concurrent fifteen-year terms and ordered his sentences in the instant case be served consecutively to previous sentences in Giles and Marshall Counties. This appeal followed.

**I**

The Defendant contends that the evidence is insufficient to support his convictions. He argues that the State failed to present sufficient proof of identity to support his convictions and that the witnesses misidentified him. The State contends that the evidence is sufficient to support the convictions and argues that the Defendant is not entitled to relief because identity was a question of fact resolved by the jury. We agree that the evidence is sufficient to support the convictions.

Our standard of review when the sufficiency of the evidence is questioned on appeal is "whether, after viewing the evidence in the light most favorable to the prosecution, any rational trier of fact could have found the essential elements of the crime beyond a reasonable doubt." Jackson v. Virginia, 443 U.S. 307, 319 (1979); State v. Williams, 657 S.W.2d 405, 410 (Tenn. 1983). This means that we may not reweigh the evidence but must presume that the trier of fact has resolved all conflicts in the testimony and drawn all reasonable inferences from the evidence in favor of the State. See State v. Sheffield, 676 S.W.2d 542, 547 (Tenn. 1984); State v. Cabbage, 571 S.W.2d 832, 835 (Tenn. 1978). Any questions about the "credibility of the witnesses, the weight to be given to their testimony, and the reconciliation of conflicts in the proof are matters entrusted to the jury as the trier of fact." State v. Dotson, 254 S.W.3d 378, 395 (Tenn. 2008) (citing State v. Vasques, 221 S.W.3d 514, 521 (Tenn. 2007)); see State v. Bland, 958 S.W.2d 651, 659 (Tenn. 1997).

Relevant to this appeal, "a person commits burglary who, without the effective consent of the property owner, enters a building with the intent to commit a felony, theft or assault." T.C.A. § 39-14-402(a)(3) (2010). Aggravated burglary is burglary of a habitation, which is defined as "any structure, . . . which is designed or adapted for the overnight accommodation of persons." T.C.A. §§ 39-14-401(1)(A), 39-14-402. A person commits arson, in relevant part, "who knowingly damages any structure by means of a fire . . . without the consent of all persons who have a possessory, proprietary or security interest therein." T.C.A. § 39-14-301(a)(1). "Identity of the perpetrator is an essential element of any crime." State v. Rice, 184 S.W.3d 646, 662 (Tenn. 2006) (citing State v. Thompson, 519 S.W.2d 789, 793 (Tenn. 1975)). Identity may be established with circumstantial evidence, and the "jury decides the weight to be given to circumstantial evidence, and 'the inferences to be drawn from such evidence, and the extent to which the circumstances are consistent with guilt . . . , are questions primarily for the jury.'" Id. (quoting Marable v. State, 313 S.W.2d 451, 457 (Tenn. 1958)).

In the light most favorable to the State, the evidence shows that the gold Saturn had not been seen at 603 Old Lane Road before the day of the fire. Mr. Gaylor identified the Defendant as the man he saw leaving Ms. Crawford's house in a gold Saturn minutes before he saw smoke come from the home. Mr. Gaylor saw an "H" and a "4" on the specialized license plate of the gold Saturn. Although Mr. Gaylor was gone for about ten minutes the morning of the fire, he said he was outside his home from the time the police left Ms. Crawford's house after investigating the vandalism until he saw the gold Saturn in the driveway. Mr. Gaylor said that he would have known if someone else had gone into the house or another car had been in the driveway the morning of the fire.

Mr. Gaylor saw the same Saturn later that day and followed it to a police roadblock. The license plate on the Defendant's car was H2941 and was an honorable discharge plate

with red, white, and blue coloring. Ms. Watts and Ms. Banks identified the Defendant as the man they saw leaving the scene minutes before they saw smoke. The Defendant's father drove a gold Saturn. Although there were varying accounts about the Defendant's clothing and the number of doors on his car, any conflicts were resolved by the jury. See Sheffield, 676 S.W.2d at 547.

Agent Robinson concluded that the cause of the fire was arson after ruling out the weather, electricity, gas, and spontaneous combustion as possible causes. We conclude that a rational trier of fact could have found beyond a reasonable doubt that the Defendant, without Ms. Crawford's consent, entered the home with the intent to set the home on fire, a felony. We also conclude that a rational trier of fact could have found beyond a reasonable doubt that the Defendant knowingly damaged the home by means of fire without Ms. Crawford's consent. The Defendant is not entitled to relief.

**II**

The Defendant contends that the trial court erred by imposing fifteen years' confinement for each conviction. He argues that his sentences are excessive based on the facts of his case and that the trial court erred in weighing enhancement factors. The State contends that the trial court properly imposed fifteen-year sentences. We agree with the State.

Appellate review of sentencing is de novo on the record with a presumption that the trial court's determinations are correct. T.C.A. §§ 40-35-401(d), -402(d) (2010). As the Sentencing Commission Comments to these sections note, the burden is on the appealing party to show that the sentencing is improper. This means that if the trial court followed the statutory sentencing procedure, made findings of fact that are adequately supported in the record, and gave due consideration and proper weight to the factors and principles that are relevant to sentencing under the 1989 Sentencing Act, we may not disturb the sentence even if a different result were preferred. State v. Fletcher, 805 S.W.2d 785, 789 (Tenn. Crim. App. 1991).

Also, in conducting a de novo review, we must consider (1) any evidence received at the trial and sentencing hearing, (2) the presentence report, (3) the principles of sentencing and arguments as to sentencing alternatives, (4) the nature and characteristics of the criminal conduct, (5) any mitigating or statutory enhancement factors, (6) statistical information provided by the administrative office of the courts as to sentencing practices for similar offenses in Tennessee, (7) any statement that the defendant made on his own behalf, and (8) the potential for rehabilitation or treatment. T.C.A. §§ 40-35-102, -103, -210; see Ashby, 823 S.W.2d at 168; State v. Moss, 727 S.W.2d 229, 236 (Tenn. 1986).

In imposing a sentence within the appropriate range of punishment for the defendant:

> [T]he court shall consider, but is not bound by, the following advisory sentencing guidelines:
>
> (1) The minimum sentence within the range of punishment is the sentence that should be imposed, because the general assembly set the minimum length of sentence for each felony class to reflect the relative seriousness of each criminal offense in the felony classifications; and
>
> (2) The sentence length within the range should be adjusted, as appropriate, by the presence or absence of mitigating and enhancement factors set out in §§ 40-35-113 and 40-35-114.

T.C.A. § 40-35-210. From this, "the trial court is free to select any sentence within the applicable range so long as the length of the sentence is 'consistent with the purposes and principles of [the Sentencing Act].'" Carter, 254 S.W.3d at 343 (quoting T.C.A. § 40-35-210(d)).

At the sentencing hearing, the presentence report was received as an exhibit. The record shows that the Defendant had previous convictions for bank robbery, attempted robbery, seven counts of statutory rape, two counts of domestic violence, criminal trespass, vandalism, resisting arrest, evading arrest, driving under the influence, reckless endangerment, and a traffic violation. Probation Officer Crystal Gray testified that the Defendant received three years' probation for the attempted robbery conviction beginning on August 24, 2009, and that the instant offenses occurred on April 23, 2010.

Ms. Gray testified that the Defendant served in the Army from 1996 to 1999 and received an honorable discharge. She said that after the Defendant was discharged from the Army, he served in the Tennessee National Guard from 1999 to 2004 and received an honorable discharge.

On cross-examination, Ms. Gray testified that the Defendant pled guilty on the same day to seven counts of statutory rape and that the Defendant passed all drug tests while on probation. She agreed the Defendant graduated from high school and said the Defendant denied using alcohol after his driving under the influence conviction. She said the Defendant had three children. She said that although the Defendant was upset and was too emotional to participate in the interview, he was not rude. On redirect examination, Ms. Gray testified

that the Defendant was arrested for bank robbery about one year after being discharged from the Army.

The trial court found and placed "great" weight on enhancement factors (1), (8), and (13) and stated that these factors were sufficient to sentence the Defendant to a fifteen-year term for each conviction. See T.C.A. § 40-35-114. The court found that enhancement factor (1) applied because the Defendant had a record of criminal convictions in addition to that necessary to establish him as a Range III, persistent offender. The court found that the Defendant was convicted of bank robbery in the United States District Court and received a sentence of thirty months' confinement and three years' probation. The Defendant had also been convicted of attempted robbery, seven counts of statutory rape, reckless endangerment, driving under the influence, evading arrest, resisting arrest, attempted criminal trespassing, vandalism, two counts of domestic violence, and speeding. The court found that factor (8) applied because the Defendant had his probation revoked in 2005 and 2010. The court found that factor (13) applied because the Defendant was on probation at the time the offenses were committed. The trial court found that mitigating factor (13) applied because of the Defendant's honorable military service. See T.C.A. § 40-35-113; State v. Allen Ray Kennedy, M2006-00847-CCA-R3-CD, slip op. at 7 (Tenn. Crim. App. Mar. 23, 2007) (stating "that an honorable military record is an acceptable mitigating factor under Tennessee Code Annotated section 40-35-113(13)").

The court found that confinement was necessary to protect society from the Defendant, who had a long history of criminal conduct. The court also found that less restrictive measures, such a probation, were unsuccessful previously. The court sentenced the Defendant to concurrent terms of fifteen years' confinement. The court ordered the sentences be served consecutively with the Giles County attempted robbery and domestic violence sentences and the Marshall County domestic violence sentence, creating an effective twenty-year sentence.

Although the Defendant claims that the trial court improperly weighed the enhancement factors, the 2005 Amendments to the 1989 Sentencing Act "deleted as grounds for appeal a claim that the trial court did not weigh properly the enhancement and mitigating factors." Carter, 254 S.W.3d at 344. The Defendant had convictions for bank robbery, attempted robbery, statutory rape, driving under the influence, and domestic violence. The Defendant was on probation at the time of the instant offenses in Giles and Marshall Counties for three different offenses and had his probation revoked previously with regard to the statutory rape convictions. The court gave great weight to the Defendant's criminal history, his failure to comply with the conditions of probation previously, and his being on probation at the time of the instant offenses. The record reflects that the trial court imposed

a sentence within the applicable range that was consistent with the purposes and principles of the Sentencing Act.  The Defendant is not entitled to relief on this issue.

In consideration of the foregoing and the record as a whole, the judgments of the trial court are affirmed.

_____
JOSEPH M. TIPTON, PRESIDING JUDGE